**In the**
**UNITED STATES DISTRICT COURT**
**for the SOUTHERN DISTRICT OF INDIANA,**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **ESTHER M. HALKER**, as personal representative of the estate of Raymond L. Halker, and **ESTHER M. HALKER**, <br><br> Plaintiffs, <br><br> *vs*. <br><br> **UNITED STATES OF AMERICA**, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     **CAUSE NO.   1:07-cv-1456-JMS-WGH** |

**ENTRY**

**Defendant=s Motion to Dismiss and Alternative**
**Motion for Summary Judgment (doc. 62)**

This suit presents two claims under the Federal Tort Claims Act, 28 U.S.C. ' 2671, *et seq.*: Esther Halker, as personal representative, asserts a claim for medical malpractice on behalf of her deceased husband=s estate and she asserts her own claim for the loss of her husband=s consortium. The United States moves to dismiss both claims for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and/or failure to state a claim under Rule 12(b)(6) (the Aand/or@ will be explained), and, alternatively, it moves for summary judgment against both claims.  For the reasons set forth herein, the Court denies the motion to dismiss and grants the motion for summary judgment.

On September 26, 2003, Raymond L. Halker underwent an operation at the Richard L. Roudebush Veterans Administration Medical Center in Indianapolis, Indiana (AVA Hospital@). Participating in the surgery were Dr. Steven G. Lalka, a vascular surgeon, as the attending surgeon,

and Dr. Rafael Azuaje, a fifth (and final) year resident surgeon, who was on vascular-surgery rotation at the time.   A right carotid endarterectomy[1] was performed to treat Mr. Halker=s right lateral carotid artery stenosis condition.[2]   During the operation, Mr. Halker=s right vagus nerve[3] was identified as being in an anterior (front) position, rather than the usual posterior (back) position.   The nerve was not directly involved in accomplishing the endarterectomy but had to be protected because of its susceptibility to damage and its location within the arterial sheath which had to be opened, or dissected, during the surgery.   The next day, it was discovered that Mr. Halker had suffered an apparent injury to his vagus nerve that resulted in Asevere and ongoing neck and throat pain, impairment of his voice function and vocal cords, inability to swallow, aspiration risk,@ permanent disability, and extreme pain and suffering.   Amended Complaint (doc. 35), && 12 and 13.   Mr. and Ms. Halker sued the United States in tort under the Federal Tort Claims Act, alleging negligence on the part of the surgeons.   *Id.*, & 16.   Mr. Halker died of unrelated causes five years later, at the age of 81,   *id.*, & 13 and Exhibit A, and Ms. Halker was substituted for him, as personal representative of his estate.

---

[1]   A carotid endarterectomy is A[a]n operation on the carotid artery for the removal of a part of the intima (innermost lining) and any material that occludes (stops up) the lumen or passage.@ J. E. Schmidt, *Attorney=s Dictionary of Medicine and Word Finder* at C-92 (Dec. 2009).   The carotid is A[o]ne of the two main arteries, the common carotid arteries, one on each side of the neck, which supply blood to the head.   . . .   Each common carotid divides into two branches in the upper portion of the neck.   The two branches are called the external carotid and the internal carotid.@   *Id*. at C-91.

[2]   Stenosis is A[t]he abnormal narrowing of a body passage, opening, canal, or duct.@   *Atty=s Dict. of Med.*, at S-291.   The Aright *lateral* carotid@ might refer to one of the external and internal branches of each carotid artery described in the previous note.

[3]   AThe tenth cranial nerve.   It has an extensive distribution, sending branches to the larynx (voice organ), trachea (windpipe), esophagus (gullet)[,] heart, stomach, intestine, liver, kidneys, etc.@   *Atty=s Dict. of Med.*, at V-11.

The Federal Tort Claims Act (AFTCA@) is a limited waiver of the United States= sovereign immunity for Acivil actions on claims against the United States, for money damages, loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.@   28 U.S.C. ' 1346(b)(1).

## Motion to Dismiss

The United States moves to dismiss the plaintiffs= claims on the ground that the physicians who operated on Mr. Halker were not employees of the United States.   Under the FTCA, the United States has waived its sovereign immunity for injuries caused by the torts of only its employees, not independent contractors.   28 U.S.C. ' ' 1346(b)(1) and 2671.   The Government=s motion asserts a lack of subject-matter jurisdiction under Rule 12(b)(1) and it has supported its argument with evidentiary matter outside the pleadings.   The plaintiffs responded on the basis of Rule 12(b)(1) as well and presented their own evidence outside the pleadings.   In its reply, however, the United States notes that three recent decisions of the Court of the Appeals for the Seventh Circuit instruct that its challenge properly might not be addressed to the Court=s jurisdiction but rather to the statutory limits or elements of the plaintiffs= claims and, therefore, should be presented as a Rule 12(b)(6) motion to dismiss for failure to state a claim.   (Defendant=s Reply (doc. 67) at 4 n. 2 (citing *Reynolds v. Untied States*, 549 F.3d 1108, 1111-1112 (7th Cir. 2008); *Parrott v. United States*, 536 F.3d 629, 634 (7th Cir. 2008); and *Palay v. United States*, 349 F.3d 418- 424-25 (7th Cir. 2003)).   But the United States also points out that a more recent

3

decision of this Court C *Walker v. United States*, No. 1:07-cv-1609-WTL-DML, 2009 WL 1951803, *1 n. 2 (S.D. Ind., July 6, 2009) C indicates that its motion might still be assertable under Rule 12(b)(1) as a jurisdictional challenge.  It doesn't choose a dog in the fight, however; it concludes that, regardless of the form, Athe Court=s analysis is similar under either rule.@  Because this procedural question about whether to proceed under Rule 12(b)(1) or 12(b)(6) was first presented in the United States= reply, the plaintiffs did not have an opportunity to address it.

In this case, the nature of the motion makes a difference.  When presented with a factual challenge to a court=s subject-matter jurisdiction under Rule 12(b)(1), the court may consider evidence beyond the pleadings in order to make the necessary factual determinations to resolve its own jurisdiction.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009); Wright & Miller, *Federal Practice and Procedure*: *Civil 3d* ' 1350, pp. 197-98 (2004).  In contrast, a Rule 12(b)(6) motion Amust be decided solely on the face of the complaint and any attachments that accompanied its filing.@  *Miller v. Herman*, 600 F.3d 726, 733 (7th Cir. 2010). However, A[i]f . . . matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56.   All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.@ Rule 12(d).  Because the parties assumed that the Government=s motion was under Rule 12(b)(1), neither side asked for, or assumed, conversion of the motion.   In addition, the government did not alternatively move for summary judgment on the employee issue,[4] which, in some circumstances, can satisfy the notice and opportunity requirements for conversion.  *Miller v. Herman*, 600 F.3d

---

[4] The Government=s Aalternative motion for summary judgment@ is directed to only the merits of the plaintiffs= claims, not to the issues of jurisdiction or pleading sufficiency.

726, 733 (7th Cir. 2010).   The stakes C and, thus, the incentive to litigate and present comprehensive evidence C are greater on a Rule 12(b)(6) motion because, unlike a Rule 12(b)(1) dismissal, summary judgments and dismissals for failure to state a claim are judgments on the merits with claim-preclusive effects.   *Spiegel v. Continental Illinois Nat. Bank*, 790 F.2d 638, 645 (7th Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Fed. Prac. and Proc.*: *Civil 3d* ' 1350, pp. 207-10.   Thus, if the Government=s motion is properly one under Rule 12(b)(6), the Court  must either exclude the extra-pleadings evidence both sides have presented and rely strictly on the allegations of the Amended Complaint, or suspend its consideration of the motion, give notice that the motion is converted to one for summary judgment, and allow the parties an opportunity to present all additional relevant material that they have.   If the Government=s motion is one under Rule 12(b)(1), then the Court must determine its subject-matter jurisdiction before addressing the Government=s alternative motion for summary judgment and the Court can do so by considering the additional evidence, without conversion or more opportunities for additional submissions.   On review of the arguments and authorities C particularly the three Seventh Circuit cases relied upon by the Government (*Palay*, *Parratt*, and *Reynolds*) and this Court=s decision in *Walker* C the Court is convinced that the Government=s motion is properly one under Rule 12(b)(1).

*Palay* and *Parrott* addressed specific statutory exceptions to governmental FTCA liability, 28 U.S.C. ' 2680, and the statutory prerequisite in ' 2675 for administrative exhaustion of FTCA claims; neither decision involved the requirement that the tortfeasor be an employee of the United States.   Presented in *Palay* with a Rule 12(b)(1) motion based on the discretionary-function exception and the administrative-exhaustion prerequisite, the Seventh Circuit observed that recent

Circuit decisions had called earlier precedent into question and Asuggest that the statutory prerequisites to suit and exceptions to governmental liability should instead be viewed as aspects of the plaintiff's statutory right to relief and, at the pleading stage, dealt with pursuant to Rule 12(b)(6).@  But the Court decided that there was no practical reason to resolve the question in that case because the district court below had excluded the extra-pleading evidence presented on the motion.  Faced in *Parratt* with the detention-of-goods and discretionary-function exceptions, the Court held that A[t]he statutory exceptions enumerated in ' 2680(a)-(n) to the United States= waiver of sovereign immunity . . . limit the breadth of the Government=s waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts.@  *Parrott*, 536 F.3d at 634.  In *Reynolds*, the district court below had granted the Government=s Rule 12(b)(1) motion to dismiss an FTCA malicious-prosecution claim for lack of subject-matter jurisdiction based on (1) the discretionary-function exception, (2) the investigative or law-enforcement officer requirement, ' 2680(h),[5] and (3) the employee requirement.  On appeal, the Government defended the dismissal only on the discretionary-function ground, conceding both the law-enforcement-officer and employee-requirement grounds.  The Seventh Circuit wrote that the Government=s motion to dismiss below was more properly one for failure to state a claim rather than lack of jurisdiction, based on *Palay*=s and *Parrott*=s rationale that the statutory exceptions of ' 2680(a) through (n) are not jurisdictional.

As the foregoing cases dealt with statutory exceptions to the FTCA as opposed to the predicate showing that an FTCA claim must be made against a government employee, the Court

---

[5] Under ' 2680(h), claims for malicious prosecution are excepted unless arising out of acts or omissions of investigative or law-enforcement officers.

finds they do not squarely reach the issue in the instant case.   Neither *Palay* nor *Parratt* dealt with the employee requirement.   Instead, their rationales were based on the distinction between statutory limitations on the scope or breadth of an action (the specific exceptions of ' 2680 and the administrative exhaustion requirement of ' 2675) and statutory grants of jurisdiction.   *Reynolds* reiterated this distinction but discussed only the status of the statutory exceptions of ' 2680(a)-(n) and, after the Government=s concessions, the Court was ultimately faced with deciding only the applicability of one of the statutory exceptions.   The employee requirement is not one of the exceptions to FTCA liability listed in ' 2680 nor is it set forth as a prerequisite to suit like the administrative-exhaustion requirement of ' 2675.   Rather, it is part of the separate statutory provision granting to the courts exclusive jurisdiction of claims against the United States for negligence or wrongful acts or omissions Aof any employee of the government while acting within the scope of his office or employment.@   28 U.S.C. ' 1346(b)(1).   *See Miller*, 600 F.3d at 732-33 (Athe location of statutory requirements can be instructive; when requirements are in provisions >separate= from a statute=s >jurisdiction-granting section,= . . . that is some indication that the requirements are not jurisdictional@).   Therefore, the Court concludes that the requirement that the alleged tortfeasor in an FTCA claim be an employee of the United States acting within the scope of his office or employment is a jurisdictional requirement of an FTCA action and that a challenge to a tortfeasor=s employment status is properly asserted by way of a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction.   *Johnson v. United States*, 534 F.3d 958, 963-64 (8th Cir. 2008); *Alinsky v. United States*, 415 F.3d 639, 643-44, 645 (7th Cir. 2005) (ACongress expressly granted jurisdiction for suits brought against the United States for its employees= conduct, and not the conduct of contractors@); *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996); *Walker v.*

*United States*, *supra*.   *See*, *CNA v. United States*, 535 F.3d 132, 140 (3rd Cir. 2008) (the issue of whether a government employee was acting Awithin the scope of his office or employment@ is jurisdictional because it is included in the section granting jurisdiction over FTCA claims and the issue was not intertwined with the merits of the claim).   Therefore, the Court analyzes the United States= motion, and the extra-pleading evidence, under Rule 12(b)(1), and the Court must determine the issue of jurisdiction before considering the Government=s motion for summary judgment.

The burden is on the plaintiffs to prove, by a preponderance of the evidence, that subject matter jurisdiction exists for their claims.   *Fed. Prac. and Proc.*: *Civil 3d* ' 1350, pp. 211; *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003).

The plaintiffs do not dispute the Government=s evidence showing that Dr. Lalka was not its employee but was an independent contractor at the time of Mr. Halker=s operation.   The VA Hospital and the Indiana University School of Medicine (AIU@) entered into a AScarce Medical Services Contract@ whereby IU agreed to provide peripheral vascular services to the Hospital.   IU agreed to provide the services of a AChief, Peripheral Vascular Surgery Section@ who would supervise and train Hospital residents   and perform direct peripheral vascular surgery services. Dr. Lalka, an Associate Professor of Surgery at IU was the Chief that IU designated to perform its obligations under the contract.   The contract specifically provided that IU, its employees, agents, and subcontractors shall not be considered employees of the VA Hospital for any purpose.   IU was responsible for worker=s compensation, liability insurance, Social Security payments, and income-tax withholding.   Dr. Lalka did not have a contract with the Hospital or the Veteran=s Administration and received no pay or benefits from either.   He received his salary and benefits

8

from IU.   The Hospital did not consider Dr. Lalka to be an employee.   The Court finds that Dr. Lalka was an independent contractor for, and not an employee of, the United States at the time of Mr. Halker=s surgery.   Therefore, the Court does not have subject-matter jurisdiction of the plaintiffs= claims for any injuries or losses caused by the acts or omissions of Dr. Lalka.

The plaintiffs also do not dispute that, as a resident physician at the VA Hospital, Dr. Azuaje was an employee of the United States.   The plaintiffs submitted an affidavit of the regional counsel of the Department of Veterans Affairs averring that the VA Hospital=s resident physicians Aare given the protection of the Federal Tort Claims Act@ and that Dr. Azuaje Awill receive the protection of the FTCA,@ Houff Affidavit (doc. 65-2) && 2 and 3,[6] and there is Seventh Circuit precedent holding that resident physicians at Veterans Administration medical centers are employees of the United States, see *Ezekiel v. Michel*, 66 F.3d 894 (7th Cir. 1995).

The Government advances two arguments why subject-matter jurisdiction is lacking despite Dr. Azuaje=s status as an employee of the United States.[7]   It first argues that Indiana=s

---

[6] The language regarding the Aprotection@ of the FTCA that is enjoyed by employees presumably refers to the immunity of 28 U.S.C.' ' 2672 and 2676, which provide that settlements and judgments in FTCA claims against the United States act as complete releases and bars of claims against the employees whose acts or omissions gave rise to the claims.

[7] Much of the parties= evidence and statements of fact on the Rule 12(b)(1) motion are devoted to which doctor did which parts of the operation and the evidence is, for the most part, circumstantial and supportive of various inferences.   No evidence or arguments were presented regarding the particular procedures of the operation that might have damaged Mr. Halker=s vagus nerve, which would have given relevance to the surgical-roles arguments.   Because the Government=s argument against subject-matter jurisdiction is based on the employment status of each surgeon, and not the procedures each performed, and because the Government did not move to dismiss for failure to state a claim or for summary judgment on the facts of the surgical roles, the Court need not determine those facts.   The Court must determine whether jurisdiction exists over only the United States, not each surgeon, and Dr. Azuaje=s status as its employee, together with the plaintiffs= allegations that he performed procedures that caused Mr. Halker=s injuries would be

Acaptain of the ship@ doctrine prevents Dr. Lalka from avoiding responsibility by delegating surgical duties to Dr. Azuaje:   A[a]s Dr. Lalka was in charge of the operation, and Dr. Azuaje was under his control and supervision, Dr. Lalka is responsible for any actions or failure to act by Dr. Azuaje.@   (Memorandum in Support of Motion to Dismiss (doc. 63) (ADefendant=s Brief@) at 10).   Relying on *Miller v. Ryan*, 706 N.E.2d 244, 250-51 (Ind. Ct. App. 1999), *trans. denied*, the Government argues that the core determinant for applying the doctrine is whether Dr. Lalka had control over what occurred during the operation, then it points to Dr. Lalka=s acknowledgment in his deposition that, as the attending surgeon and Chief of the Peripheral Vascular Surgery Section, he was in charge during the operation and was responsible for any acts or omissions during the procedures.   But the Government stretches the doctrine too far:   while it prevents a physician from avoiding liability when he delegates his duties to another, the Court finds nothing in the doctrine that allows the *delegee* to avoid liability for his own negligent acts and omissions when performing the delegated duties.   Even if ultimate responsibility for all acts and omissions during Mr. Halker=s operation remains with Dr. Lalka, the Government has not shown that the captain-of-the-ship doctrine divests Dr. Azuaje of responsibility for his own conduct that caused, or helped to cause, the plaintiffs= injuries.   Apparently recognizing that Indiana has rejected this

---

sufficient ground for jurisdiction.

        In response to the Government=s alternative summary judgment motion, the plaintiffs cited a portion of their expert=s deposition wherein he testified that the blunt dissection and high-level electrocauterization that was used on Mr. Halker=s artery was not appropriate.   But there were also suggestions in other evidence submitted that arterial clamping and other handling of the nerve also could have caused the injury.   At any rate, the Government=s motion for summary judgment asserted the absence of expert medical evidence on the standard of care for carotid endarterectomies and on the breach of that standard in this case.   Because those are the issues that the parties actually litigated C not the possible causes of the nerve damage or which surgeon was responsible for each possible cause C the Court has no occasion to determine those other issues.

offensive use of the captain-of-the-ship doctrine, *see*, *Chi Yun Ho, M. D. v. Frye*, 880 N.E.2d 1192, 1197-1201 (Ind. 2008), the Government advanced its second argument for lack of jurisdiction in its reply.[8]

Secondly, the Government argues in its reply brief that Dr. Azuaje was Dr. Lalka=s Aborrowed servant@ at the time of Mr. Halker=s operation and, therefore, was the employee of an independent contractor and not the United States.   Although Athe district court is entitled to find that an argument raised for the first time in a reply brief is forfeited,@ *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009); *United States v. Curlin*, No. 1:09-cr-29-SEB-KPF, 2010 WL 582206, * 3 (S.D. Ind., Feb. 10, 2010); *Wal-Mart Stores, Inc. v. S. C. Nestel, Inc.*, No. 1:07-cv-470-DFH-JMS, 2009 WL 838586, * 4 n. 2 (S.D. Ind., Mar. 30, 2009), the Court will address the Government=s argument because it suggests another reason for the absence of subject-matter jurisdiction and the Court are independently obligated to assure ourselves of its existence.[9]

_____

[8]  Amid its captain-of-the-ship argument, the Government made an isolated assertion that ADr. Lalka himself performed all procedures likely to have caused the injury.@   (Defendant=s Brief at 10).   Not only is such an assertion inapposite to the applicability of the doctrine C which seeks to hold physicians responsible *even if* they did not perform all procedures likely to have caused injury C but, as the Court mentioned above, the Government did not support such an assertion with a developed factual or legal showing.

[9]  The Government attempted to excuse its failure to present this argument earlier by claiming that, although it did not Aspecifically@ refer to the borrowed-servant doctrine in its opening Brief, Athe argument raised therein is sufficient to present that issue to the Court.@ (Defendant=s Reply (doc. 67) at 5 n. 4).   Needless to say, the   Brief did not sufficiently present the borrowed-servant issue to either the Court or the plaintiffs and neither should have been expected to divine such a specific legal and factual argument lurking in the Government=s Brief.   The Government was obligated to explicitly assert all arguments on which it intended to rely in its opening brief.   It cannot task opposing parties with the burden of predicting, constructing, and then responding to additional arguments on its behalf lest the Government sandbag them in reply.

Whether Dr. Azuaje was an employee of the United States for FTCA purposes is a question of federal, not state, law, *Ezekiel*, 66 F.3d at 899, but "[w]hether or not the borrowed servant rule ought to be applied is a question that must be answered with reference to 'the law of the place where the act or omission occurred,'" *Green v. United States*, 709 F.2d 1158, 1162 n. 3 (7th Cir. 1983). *Cf.*, *Taboas v. Mlynczak*, 149 F.3d 576, 582 (7th Cir. 1998) (whether an employee was acting within the scope of his employment is a question of state law).

The Government asserts that, during Mr. Halker's operation, Dr. Azuaje was working as a borrowed servant, *i.e.*, a special employee, of Dr. Lalka, not the United States and, therefore, Dr. Lalka is the only person responsible for any negligence of Dr. Azuaje *via respondeat superior*. The Government mentioned that there was a seven-factor analysis in Indiana for application of the borrowed-servant doctrine, citing *Moberly v. Day*, 757 N.E.2d 1007, 1010 n. 3 (Ind. 2001), and *Fioretti v. Aztar Indiana Gaming Co., LLC*, 790 N.E.2d 587, 589 (Ind. Ct. App. 2003), but it identified and asserted only one of the factors: "the right to exercise control over the manner and means by which the work is to be accomplished." *Moberly*, 757 N.E.2d at 101 n. 3. It contends that Dr. Lalka's deposition establishes that he had such control over the actions of Dr. Azuaje during the operation and, because this is the most important factor in the borrowed-servant analysis, *id.*, Dr. Azuaje should be deemed to have been the temporary special employee of Dr. Lalka during the acts and omissions out of which the plaintiffs' claims arise.

In the portions of his deposition that the Government cites, Dr. Lalka describes generally his interaction with residents during surgeries. In accord with the training nature of the residency program at the VA Hospital, Dr. Lalka instructs, demonstrates, and advises on surgical techniques and ensures that procedures are done correctly. The degree of his interaction is varied and

12

progressive based on the training level of the resident C *e.g.*, third-year *versus* fifth-year resident C the resident=s personal skill level, and the complexity or sensitivity of the particular procedure being performed.   Dr. Lalka also performs certain difficult or risky surgical procedures himself depending on the abilities of the particular resident with whom he is operating.   Lalka Deposition (doc. 72-1) at 15-18.   Dr. Lalka also testified that he always assumed that he would be responsible for whatever happened when performing and supervising operations with residents.   *Id.* at 18.

Even if the level of supervision or control that Dr. Lalka had over the residents during surgeries rendered them his employees, or borrowed servants, the Court concludes that the residents also retained their statuses as employees of the VA Hospital during surgeries.   The Government recognizes this legal possibility of dual employers by its citation to this Court=s decision in *Yeary v. United States*, 921 F.Supp. 549 (S.D. Ind. 1996), wherein Judge Hamilton summarized Indiana law on dual employment:

> Indiana courts have articulated three standards to determine when an employee has been Aborrowed@ so as to affect liability questions.   Courts generally consider (1) Awhose business@ the employee was furthering at the time of the negligence; (2) which employer had the right to Acontrol@ the specific act in question; and (3) whether the employee=s work was within the scope of the borrowing employer=s business.   *Progressive Constr. & Eng=g Co. v. Indiana & Michigan Elec. Co.*, 522 N.E.3d 1279, 1284 (Ind. App. 1989); see generally *New York Central R. R. Co.* [*v. Northern Indiana Public Service Co.*], 140 Ind. App. 79, 221 N.E.2d [442] at 447 (describing the principles as Adeceivingly simple@).
>
> Although the articulation of these tests implies that courts must choose between the two employers in allocating *respondeat superior* liability, Indiana law provides for the possibility of both employers being liable for the negligence of Aborrowed servants.@   *Johnson v. Motors Dispatch, Inc.*, 360 N.E.2d 224, 228-29 (Ind. App. 1977); *New York Central R. R. Co.*, 221 N.E.2d at 446, 451 (citing Restatement (Second) of Agency ' 226 (1958)).   It has been said that the borrowed servant doctrine relieves the original employer of liability if its employees= service to the borrowing employer necessarily involves the abandonment of their service to the original employer.   *New York Central R. R. Co.*, 221 N.E.2d at 446; *Logestan v. Hartford Steam Boiler Inspection and Ins. Co.*, 626 N.E.2d 829, 836 (Ind. App.

13

1993) (Robertson, J., dissenting); Restatement (Second) of Agency ' 226 (1958).

> \*      \*      \*
>
> The Indiana cases dealing with the prospect of dual liability appear to give considerable weight to the general employer=s usual ability to hire and fire the employee, even where the employee has been Aloaned@ to another employer.
>
> \*      \*      \*
>
> . . . the Indiana cases have also approved language in the Restatement (Second) of Agency ' 226 to the effect that a person may be the servant of two masters at one time as to one act, Aif the service to one does not involve abandonment of the service to the other.@

*Yeary*, 921 F.Supp. at 555, 558.   See also *Mannon v. Howmet Transport Service, Inc.*, 641 N.E.2d 70, 73 (Ind. Ct. App. 1994); *Johnson v. Motors Dispatch, Inc.*, 360 N.E.2d 224, 228-29.

The Court concludes that Dr. Azuaje remained an employee of the United States during Mr. Halker=s surgery for three reasons:   the United States= representation, Congressional intent, and application of Indiana=s seven-factor dual-employment analysis.

First, the Government=s argument that Dr. Azuaje was only the employee of Dr. Lalka during Mr. Halker=s surgery contradicts the affidavits by officials of the Department of Veterans Affairs.   As the Court noted above, the Department=s Regional Counsel asserted in his affidavit:

> 2. That resident physicians are given the protection of the Federal Tort Claims Act as long as they remain in the scope of their employment for the Department;
>
> 3. Pursuant to the affidavit executed by Kenneth Klotz, M.D. on August 1, 2006, Rafael Azuaje, M.D. was a resident physician at the Richard L. Roudebush VA Medical Center, Indianapolis, on and around September 26, 2003 and thus, will receive the protection of the FTCA.

Houff Affidavit (doc. 65-2) (citations omitted).[10]   When formally declaring Dr. Azuaje=s status,

---

[10] Kenneth Klotz, M.D., Chief of Staff at the VA Hospital, had averred that Aduring the time period on and around September 26, 2003, Dr. Rafael Azuaje was a resident physician at the Richard L. Roudebush VA Medical Center.@   (Doc. 65-3).

14

therefore, neither the VA=s Regional Counsel nor the VA Hospital=s Chief of Staff asserted or even suggested that Dr. Azuaje was not the VA=s employee during the relevant time of Mr. Halker=s surgery.   No modifications to the affidavits were submitted after the Government filed its reply challenging Dr. Azuaje=s employment status.   Neither did the Government attempt to explain the apparent discrepancy.   The Court assumes that the VA=s Regional Counsel is fully informed regarding the resident-status issues raised in this and similar FTCA cases.   Considering its next reason for rejecting the Government=s borrowed-servant argument, however, it is not unexpected that the Department of Veterans Affairs= position would be that its resident physicians, including Dr. Azuaje, are its employees even when performing surgeries under the supervision of independent contractors.

The second reason that the Court rejects the Government=s argument that Dr. Azuaje was not an employee of the United States is that it contradicts the statutory purpose to provide immunity to the VA=s resident physicians.   *See Ezekiel*, 66 F.3d at 900-01, 903.   The statute authorizing the Department of Veterans Affairs to establish residency programs and to appoint qualified persons thereto, provides that the Secretary Amay prescribe the conditions of employment of persons appointed . . . including necessary training@ and that medical schools and other hospitals may participate in the training of residents.   38 U.S.C. ' 7406(b) and (c).   In addition, residents= periods of service are creditable for purposes of federal employee retirement benefits.   38 U.S.C. ' 7406(c)(3)(B).   In *Ezekiel*, the Seventh Circuit recognized that the intent and effect of this statutory scheme was to make residents employees of the VA:   AThus, it is clear that the statute treats a resident physician appointed to a VA hospital as personnel in the Department of Veterans Affairs, and *while serving in this capacity* he is classified an employee of the Government.@

15

*Ezekiel*, 66 F.3d at 901 (emphasis added).   The Court also repeated its earlier holding that granting tort immunity to residents is a vital part of the statutory scheme:

> The legislative history of [38 U.S.C. ' 7316] indicates that it was the intent of Congress that the immunity granted to the VA physicians and surgeons be broad because the benefits of section [7316] coverage were seen as Aan aid in the recruitment of much needed personnel.@  S.Rep. No. 92-776, 92nd Cong., 2d Sess. 51 (1972).  It is obvious after reviewing the legislative histories of sections [7405, 7406, and 7316] that Congress in adopting this legislation was attempting to secure the services of the most qualified physicians and surgeons in their respective specialties in a particular geographical area and that immunity from liability was beyond all doubt intended as an inducement.   Immunity from liability definitely is a substantial inducement in our litigious society of today.   Since a grant of immunity under section [7316] to physicians and surgeons employed on a temporary basis for a fixed period of time under section [7405 and 7406] furthers the section [7316] goal of improving the recruitment of the most qualified specialized medical personnel and the overall quality of medical care in VA hospitals, it was the obvious intent of Congress that those doctors recruited to serve on a temporary basis for a fixed period of time should also enjoy the immunity protection of section [7316].   We hold that Congress intended to extend section [7316] immunity to all section [7405 and 7406] physicians and surgeons operating in the VA program.

*Quilico v. Kaplan*, 749 F.2d 480, 486-87 (7th Cir. 1984).   *Ezekiel*, 66 F.3d at 901 (quoting this passage).

The immunity granted to residents by 38 U.S.C. ' 7316(a) states that the FTCA shall be the exclusive remedy for any claim for damages for injuries Afrom malpractice or negligence of a medical care employee of the Administration in furnishing medical care or treatment *while in the exercise of that employee=s duties in or for the Administration.*@  (Emphasis added).   Performing surgeries on VA patients under the tutelage and supervision of experienced medical personnel is a core part of the educational and training nature of residents= employment with the VA and is part of their Aduties in and for the Administration.@  *See Ezekiel*, 66 F.3d at 904.   These facts are not altered because the VA has so arranged its residency program that a contractor, Dr. Lalka, provides

16

some of that training and supervision to the VA=s residents C under standards set by the VA C while they are performing surgeries on VA patients.   Were resident immunity withdrawn for all surgeries supervised by Dr. Lalka and other VA contractors, the Congressional purpose to allow the VA to recruit the best qualified physicians to its hospital would be seriously compromised.

Finally, the Court rejects the Government=s argument that Dr. Azuaje was not acting as an employee of the VA when operating on Dr. Halker based on Indiana law.   The seven factors examined for determining whether a person is the employee of two employers are:   A(1) right to discharge; (2) mode of payment; (3) supplying tools or equipment; (4) belief of the parties in the existence of an employer-employee relationship; (5) control over the means used in the result reached; (6) length of employment; and (7) establishment of the work boundaries.@   *Moberly*, 757 N.E.2d at 1010 n. 3.   As mentioned, the Government identified and argued only the fifth factor C Athe right to exercise control over the manner and means by which the work is to be accomplished, @ *id*. C and, while the Indiana Supreme Court has held that this is the most important factor, *id*.; *GKN Co. v. Magness*, 744 N.E.2d 397,406 (Ind. 2001), it has also instructed that no single factor is dispositive, *Moberly*, 757 N.E.2d at 1010, but that A[t]hese factors must be weighed as part of a balancing test, and not merely tallied in a majority-wins formulation.@   *Id*., n. 3.   *GKN Co. v. Magness*, 744 N.E.2d at 402.   As noted above, a borrowed employee relieves the original employer of liability only if the employee=s service to the borrowing employer necessarily involves the abandonment of his service to the original employer.

There is no evidence that Dr. Lalka had the power to discharge or refuse to train[11] any of

---

[11] The special (borrowing) employer=s right to discharge does not necessarily mean the right to terminate the employee=s position with the general (lending) employer.   It can mean the

the VA Hospital=s residents with whom he operated.   Residents worked at the VA Hospital for training purposes, and performing surgeries under the tutelage of Dr. Lalka was an integral part of both their training and his contractual obligations.   This factor indicates that the residents did not abandon their employment with the VA Hospital when they performed surgeries with Dr. Lalka.

Although the evidence does not explain how the residents were paid, there is no dispute that they were not paid by Dr. Lalka and received no employment benefits from him.   This factor indicates that the residents retained employment with the VA Hospital even when performing surgeries under Dr. Lalka=s tutelage.

It appears that the surgeries in which the residents were involved with Dr. Lalka were performed at the VA Hospital, using its equipment, tools, and other facilities.   This factor indicates that the residents did not abandon their employment with the VA Hospital.

There is no evidence that Dr. Lalka, the VA Hospital, or the residents believed that residents abandoned their employment with the VA Hospital and entered an employer-employee relationship solely with Dr. Lalka during the time of their surgeries with Dr. Lalka.

The evidence shows that Dr. Lalka supervised, instructed, and advised the residents during the surgeries that they performed.   It is also evident, from Dr. Lalka=s testimony, that he exercised that control less with experienced, skilled residents such as fifth-year residents, which Dr. Azuaje was.   There was no direct evidence submitted on the present motion regarding the extent of direction that Dr. Lalka gave to Dr. Azuaje during Mr. Halker=s operation, but it is clear that, Chief

---

right of the special employer to refuse the employee permission to work the special job.  *GKN*, 744 N.E.2d at 404-05.

of Vascular Surgery at the Hospital and attending surgeon for Dr. Halker=s operation, he retained

the authority to control Dr. Azuaje=s performance of the surgery, even if he gave Dr. Azuaje

greater latitude in practice.   While there was no evidence that officials of the VA Hospital had

Aspot control@ during the actual surgeries,[12] the VA Hospital had standards, policies, and

procedures regarding the performance of surgeries that even Dr. Lalka had to follow, and

presumably the Hospital had the authority to enforce those standards on, and provide additional

training to, residents whose surgery performances needed improvement.   That Dr. Lalka had the

authority to and did exercise supervision and control over the residents during their surgeries is not

dispositive; the determinative question is whether the residents abandoned their employment with

the VA Hospital during the relatively short times of surgeries.

Presumably, the time that residents spent with Dr. Lalka in surgery was sporadic and

short-term, compared to the long-term course of their residencies at the VA Hospital.   Surgeries

were periodic interpositions throughout their residencies.   This factor suggests that residents did

not abandon their employment with the VA Hospital when performing surgeries.

It appears that the VA Hospital established the Awork boundaries@ and conditions within

which the residents worked and the surgeries were performed.   This factor tends to indicate that

residents retained their employment with the VA Hospital.

Examining and weighing these factors against each other, the Court finds little indication

that residents abandoned their employment with the VA Hospital.   The training residents received

---

[12] AIndiana focuses most often on . . . the >spot control= test:   >which employer had the right
to control the specific act in question.=@   *Yeary*, 921 F.Supp. at 557.

under Dr. Lalka≠s tutelage during vascular surgeries was an integral part of their overall training in the residency program at the VA Hospital.   Dr. Lalka, as the vascular surgeon assigned by IU to the VA Hospital, was contractually obligated to provide vascular surgical training to the Hospital≠s residents.   When performing surgeries with Dr. Lalka, therefore, the residents were not leaving or abandoning the residency program, *i.e.*, their employment, with the VA Hospital; rather, they were fulfilling a vital and integral purpose of that residency program:   the receiving of training and practical experience in order to improve their medical education and skills.   Moreover, the surgeries that the residents performed with Dr. Lalka were not undertaken in order to benefit Dr. Lalka, but to serve the medical mission of the VA Hospital by treating its patients.   Therefore, the Court concludes that, even if Dr. Azuaje became a borrowed servant of Dr. Lalka during Mr. Halker≠s surgery, he did not abandon his employment with the United States, but remained an employee of the United States during the surgery.

For these reasons, the Court finds and concludes that Dr. Azuaje was an employee of the United States during Mr. Halker≠s operation and, therefore, the Court has subject matter jurisdiction of the plaintiffs= claims against the United States.   The Government≠s motion to dismiss is **DENIED**.

### Motion for Summary Judgment

As often happens in federal suits, the jurisdictional issues in this case proved to be more involved than the claims issues.   The Court concludes that the plaintiffs cannot prove all essential elements of their claims.   To prove a medical malpractice claim in Indiana, A[t]he plaintiff must show:   (1) a duty owed to the plaintiff by the defendant; (2) a breach of duty by allowing conduct to fall below the applicable standard of care; and (3) a compensable injury proximately caused by

20

the defendant's breach of duty.   *Nasser v. St. Vincent Hosp. and Health Services*, 926 N.E.2d 43, 48 (Ind. Ct. App. 2010).   The Government argues that the plaintiffs cannot prove a breach of the standard of care or a proximate causation.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c)(2).

**Standard of care.**   For medical-malpractice actions in Indiana, the standard of care is defined as "the degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class to which the physician belongs, acting under the same or similar circumstances."   *Howard Regional Health System v. Gordon*, 925 N.E.2d 453, 458 (Ind. Ct. App. 2010), *trans. denied* (quoting *Whyde v. Czarkowski*, 659 N.E.2d 625, 630 (Ind. Ct. App. 1995), *trans. denied*.)   A fundamental requirement is that "[a] plaintiff must present expert testimony to establish the applicable standard of care and to show whether the defendant's conduct falls below the standard of care."   *Musser v. Gentiva Health Services*, 356 F.3d 751, 760 (7th Cir. 2004) (citing *Narducci v. Tedrow*, 736 N.E.2d 1288, 1292 (Ind. Ct. App.2000)).

The plaintiffs named one expert witness, Gregory S. Schmitt, M. D.,[13] who offered his

---

[13]  It is not clear from the *curriculum vitae* attached to Dr. Schmitt's letters or from the few pages of his deposition submitted on the motion what position Dr. Schmitt held at the time that he gave his opinions.   He has held various positions at a hospital in Fort Wayne, Indiana including chairman of its Section of Cardiovascular and Thoracic Surgery, from 1994 to 1999, and practiced as a surgeon with Fort Wayne Cardiovascular and Thoracic Surgeons from 1989 to 2000.   The most recent positions identified on his *C. V.* are attending physician at Parkview Memorial Hospital from 1989 to 2006 and as medical director of Visiting Nurse and Hospice Home, both in Fort Wayne.   (Doc. 65-10).

medical opinion by way of two brief letters to counsel, (doc. 65-10, pp. [1] and [3]), and his deposition, (docs. 64-7 and 65-9).   In his first letter to plaintiffs' counsel, dated March 1, 2005, Dr. Schmitt makes only one statement that could be characterized as a relevant medical opinion. It reads, in full:  "it appears that this patient's post-operative complications were the result of improper handling of the right vagus nerve during the course of the operation."  There is no description or even suggestion of the nature of the mishandling, what made it improper, or the medical basis for the conclusion.   The remainder of Dr. Schmitt's letter merely describes a few documents that he expected to find in the records provided to him for review but which he suspects are missing; calls counsel's attention to attached copies of portions of two standard vascular-surgery textbooks; and highlights some issues and questionable items in the records that might be of interest to counsel's case.   There is no discussion, let alone conclusion or opinion, regarding the applicable standard of care in this case, whether that standard was breached, or whether that breach proximately caused Mr. Halker's injuries.   Neither does Mr. Halker discuss, identify, or speculate about what Dr. Lalka and Dr. Azuaje might have done wrong.   Dr. Schmitt's undated second letter was written after he reviewed unidentified additional records.   This letter contains no opinion on the likely causes of Mr. Halker's injuries, the applicable standard of care, or whether and how that standard was breached.   Instead, this letter is devoted to identifying some "items in the medical record that raise concerns regarding the conduct of the operation."  To describe these two letters as either opinion letters or expert-witness reports would be disingenuous and the Government justifiably complains about the lack of disclosure of Dr. Schmitt's opinions which he first revealed during his deposition in August 2009.

Dr. Schmitt's deposition did not fill these gaps.   When asked what the basis was for his

opinion in his first letter that Mr. Halker=s injuries were caused by Aimproper handling of the vagus nerve,@ Dr. Schmitt answered that his opinion was based solely on the result that the nerve was damaged.   Schmitt Deposition (doc. 64-7), pp. 72 and 127.   Asked what he meant by Aimproper,@ he answered Anot proper.@   *Id.*   He stated that he did not know how the nerve was not properly protected or what Drs. Lalka and Azuaje did wrong because the operative note was vague.   *Id.* at 114.   He said that no one could know because of the state of the record.   *Id.*   Later in the deposition, Dr. Schmitt was asked Awhat are the events or procedures that most likely could have caused injury to the vagus nerve.@   This time, he identified possible causes for the nerve damage: (1) the surgeons= use of blunt dissection with electrocautery, or ABovie dissection,@ *id.* at 138; (2) the use of a drain, *id.*; and (3) the aborted attempt to insert a shunt, *id.* at 138-40.   Earlier, Dr. Schmitt had expanded on his opinion regarding the surgeons= use of blunt dissection and electrocautery:

> If you read the operative note, it says AThe carotid artery was exposed by blunt and electrocautery dissection.@  If you read the literature to [*sic*] risk for a nerve injury, particularly recurrent laryngeal nerve, it=s blunt dissection and use of electrocautery.  If you look at the operative notes or the information that I have available, that C that C that cautery was set at 30 and 40; that=s usually cut and coag.  You can=t work around a nerve with that high of electrocautery.   There=s no role, when you=re trying to protect the car C or the vagus nerve, for blunt dissection.   There has to be sharp dissection between the adventia of the artery you=re mobilizing and the sheath which the nerve lies within.   That=s not documented on the record.

*Id.* at 90-91.

Although Dr. Schmitt testified that he was familiar with the term Astandard of care,@ he could not, or would not, define it.   *Id.* at 72.   Later, he declined to define standard of care[14] but,

---

[14]  AYou know, I C I guess C I=m not here to comment about standard of care about the entire field of medicine.   So I=m not quite sure C I mean, I C I would like to   C if you C I would

when pressed, he offered his most precise definition of the term:

>          Regarding the standard of care in this particular circumstance, if there was a
> bad outcome, then one has to reflect back or look back as to how the issue or the
> case was handled.   And if everything was done appropriately and you still had that
> negative outcome, then I C you would have to say standard of care was met.   If it
> was not done appropriately, then I would say the standard of care was not met.

*Id.* at 77-78.   Asked his opinion regarding the specific standard of care for carotid

endarterectomies, Dr. Schmitt responded:   ΑBecause you have a good result, a satisfactory result.

And that if you don≠t have a satisfactory result, that if everything appropriate was done during the

entire time of care.@   *Id.* at 78.   When asked whether use of blunt dissection constituted

malpractice or was a breach of the standard of care, Dr. Schmitt responded:

>          Q.    In your definition of malpractice, was it malpractice for the surgeons to
> use a blunt dissection here?
>
>          A.  I will respond to that by saying it is inappropriate dissection of the neck
> during a carotid endarterectomy.
>
>          Q.  Yeah, but was it malpractice?   Was it outside the standard of care?
>
>          A.  I think that≠s C is that out C it is inappropriate to use that technique.
>
>          Q.  Is it malpractice?
>
>          DR. SCHMITT:   In my opinion?
>
>          [COUNSEL]:   Yeah.
>
>          A.  It≠s inappropriate technique.
>
>          Q.  Is it malpractice?
>
>          A.  I don≠t know.

---

like to answer questions about the particular case we≠re discussing.@   Schmitt Dep. at 77.

*Id.* at 95.[15]   Dr. Schmitt agreed that it was possible to have an injury to the vagus nerve even if the surgeon performed to the standard of care, *id.* at 112, and that injury to the vagus nerve alone does not mean that the surgeon did something wrong, *id.*, or committed malpractice, *id.* at 113.   But he testified that, A[i]f the nerve was identified, and proper technique was used to both dissect it and preserve it, it would be very unlikely to have an injury to that nerve.@   *Id.*

The only instance where Dr. Schmitt made a definitive statement about a specific breach of the standard of care in this case was when he testified that, even though the surgeons= use of a drain was one of the Aevents or procedures that most likely could have caused injury to the vagus nerve,@ *id.* at 137, and despite the Aevidence that says there=s a higher incidence of vagal nerve injury when you use a drain,@ *id.* at 138, he agreed that Ait was not below the standard of care to use the drain in this case,@ and he stated that he Awould not argue with the use of a drain whatsoever,@ *id.*

A medical expert must show that he Ais familiar with the proper standard of care under the same or similar circumstances, what that standard of care is, and that the defendant=s treatment of the plaintiff fell below that standard.@   *McIntosh v. Cummins*, 759 N.E.2d 1180, 1184 (Ind. Ct. App. 2001), *trans. denied*.   Neither Dr. Schmitt=s two letters nor his deposition testimony indicated that he was familiar with the relevant standard of care in this case C *i.e.*, the degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class as Dr. Azuaje operating under the same or similar circumstances as Dr. Azuaje

---

[15]   Immediately following this exchange, Dr. Schmitt was asked whether the surgeons= use of electrocautery at the level he described was malpractice.   His answer was not submitted on this motion.   The Court also notes the awkwardness in counsel=s questions.   An expert medical opinion on the legal conclusion of Amalpractice@ is not required; an opinion on the applicable standard of care is.

during Mr. Halker=s surgery.  Dr. Schmitt often did not seem to understand the concept of standard of care in medical-malpractice cases or its critical (in fact, dispositive) role in this case. He resolutely refused to define the term or to describe the actual standard of care that applied to the surgeons= performance of Mr. Halker=s surgery.  He adhered to his opinions based on Aappropriateness@ and, except for a few isolated exceptions when agreeing with particular questions, he went no further.  But the Court cannot simply assume that Dr. Schmitt=s Aappropriateness@ standard is equivalent to the legal standard of care, especially when he steadfastly refused to define the term or to describe the standard of care that applied to the surgeon=s actions.  The plaintiffs= claims cannot proceed founded on what might be only Dr. Schmitt=s personal, idiosyncratic idea of surgery standards.

The plaintiffs are correct that A[a]n expert=s opinion need not expressly state familiarity with [the] applicable standard of care if [his] opinion letter specifically describing [the] procedure showed familiarity with [the] applicable standard of care.@  (Plaintiffs= Response (doc. 66) at 24, citing *McIntosh*, 759 N.E.2d at 1184, and *Aldrich v. Coda*, 732 N.E.2d 243, 245-46 (Ind. Ct. App. 2000)).  The problem, however, is that Dr. Schmitt=s two letters, *C. V.*, and deposition testimony established no familiarity with the applicable standard of care in this case.   Even if his credentials and vascular-surgery experience might, in normal circumstances, justify an assumption that he has such familiarity, his unresponsive answers to the standard-of-care questions during his deposition do not warrant indulging such an assumption in this case.   At any rate, besides familiarity with the applicable standard of care, the plaintiffs offered no justification for Dr. Schmitt=s inability or refusal to define it or to opine whether the surgeons= conduct fell below it in this case.

The plaintiffs highlighted two specific opinions that Dr. Schmitt made, presumably as

26

valid expert medical opinion regarding the applicable standard of care and/or its breach. (Plaintiff=s Response at 26). The first is described as a Acritique@ of the operative note on the surgery and is quoted by plaintiffs:

> The nerve was identified. The operative note says that, ACare was taken to protect the nerve.@ There=s no description of how it was done. So, when you identify a very important nerve and you say you=re going to protect it and you=re not protecting it, one has to wonder.

*Id*. (quoting Schmitt Dep. at 90). The plaintiffs offer no explanation of how this testimony helps them. Obviously, the standard-of-care element of a medical-malpractice action in Indiana means something more definite than circumstances that make one wonder.

The second opinion of Dr. Schmitt highlighted by the plaintiffs is his testimony that, according to medical literature, the use of blunt dissection and electrocautery Acreates a risk for nerve injury@ and was Ainappropriate for a carotid endarterectomy procedure.@ (Plaintiffs= Response at 26). Almost all aspects of surgery, the Court assumes, carry risks of varying degrees. Dr. Schmitt himself identified the surgeons= use of a drain as a risky procedure that was one of the Amost-likely causes@ of the injury to Mr. Halker=s vagus nerve, but a procedure with which he would not argue and one which he felt was not inappropriate. The existence of risk alone is irrelevant to the issue of standard of care; what is needed is expert medical opinion that, considering all of the circumstances of, *inter alia*, the patient=s condition, the available treatment and surgical options, and the state of medical science and art at the time, did the decision to use, or the use of, a particular procedure or technique instead of another procedure or technique, fall below the applicable standard of care? Moreover, as discussed above, Dr. Schmitt=s opinion based on an undefined appropriateness standard does not substitute for the required expert medical opinion on the applicable legal standard of care.

An essential element of a medical-malpractice action in Indiana is proving that the defendant=s conduct fell below the applicable standard of care, which is Athat degree of skill and care ordinarily possessed and exercised by a reasonably careful, skillful and prudent practitioner in the same class to which he belongs treating such maladies under the same or similar circumstances.@  *McIntosh*, 759 N.E.2d at 1184.   Because Dr. Schmitt=s testimony and letters fail to address these definitional components, the plaintiffs have not shown that they can prove that Dr. Azuaje=s surgery on Mr. Halker fell below the applicable standard of care.

**Proximate causation.**  Finally, the Government is correct that the plaintiffs have not shown that they can prove the element of causation, not to mention proximate causation.  As noted above, Dr. Schmitt could not identify the cause of the damage to Mr. Halker=s vagus nerve. He listed some Amost likely@ causes but also testified to the effect that these procedures could be employed without damaging the vagus nerve.  Dr. Schmitt also testified that, even if a carotid endarterectomy were done properly, damage to the vagus nerve could result, presumably from the necessary manipulation of the extremely sensitive nerve.  Without evidence of proximate causation of the plaintiffs= injuries, a jury cannot determine whether a particular breach of the standard of care is even relevant and would be left to speculate.

The Government has shown that there is no genuine dispute of a material fact and that they are due judgment as a matter of law.   Therefore, its motion for summary judgment is **GRANTED**.

**Conclusion**

For the reasons explained above, the United States= Motion to Dismiss and Alternative Motion for Summary Judgment (doc. 62) is **GRANTED IN PART AND DENIED IN PART**. The motion to dismiss is **DENIED** and the alternative motion for summary judgment is **GRANTED**.  Because the summary judgment is effective against all of the plaintiffs= claims, final judgment will issue.

**SO ORDERED.**

Date:  07/16/2010

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

J. Spencer Feighner, HALLER & COLVIN PC, jsf@hallercolvin.com

John O. Feighner, HALLER & COLVIN PC, jfeighner@hallercolvin.com

Jeffrey L. Hunter, UNITED STATES ATTORNEY'S OFFICE, jeff.hunter@usdoj.gov